IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED
JAN - 6 2010
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

JUSTIN GAUTHREAUX,

    Plaintiff,

v.                                                                          CIVIL ACTION NO. 2:08cv387

UNITED STATES OF AMERICA,

    Defendant.

*MEMORANDUM OPINION AND ORDER*

The Court commenced a bench trial in the above-captioned matter on November 3, 2009. Closing arguments were held on November 5, 2009. Having conducted a trial and thoroughly reviewed the evidence, arguments, and records in this case, the Court finds that this case is ripe for decision. For the reasons stated below, the Court awards judgment to Defendant.

## I. PROCEDURAL HISTORY AND FACTUAL FINDINGS

### A. Procedural History

On August 18, 2008, Justin Gauthreaux ("Plaintiff") filed the above referenced complaint against the United States of America ("Defendant" or "United States") alleging, *inter alia*, negligence. The case against the Defendant arises out of an admiralty and maritime claim pursuant to the Public Vessels Act, 46 U.S.C. § 31101 *et seq.* and the Suits in Admiralty Act, 46 U.S.C. § 30901 *et seq.* (Compl. ¶ 1.) Plaintiff was an employee covered under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950. Plaintiff's claim against

1

Defendant, as shipowner, is allowed under 33 U.S.C. § 905(b). Plaintiff seeks to recover damages suffered when a forklift operator on a Navy vessel ran over Plaintiff's foot on January 29, 2007, causing Plaintiff's foot to be amputated. (Compl. ¶ 2.)

On or about December 23, 2008, Plaintiff filed Civil Action No. 2:08cv615 against Defendant Wiggins Lift Co., Inc. ("Wiggins") in this Court alleging, *inter alia*, breach of maritime product liability duties, breach of strict liability, failure to warn, and negligence. On January 16, 2009, after finding common questions of law and fact, this Court consolidated the above captioned cases into Civil Action No. 2:09cv387 for purposes of pretrial and trial proceedings .

On August 10, 2009, Plaintiff filed a Motion for Summary Judgment. On August 28, 2009, Wiggins filed a Motion for Summary Judgment. On October 16, 2009, the Court denied Plaintiff's motion, and granted Defendant Wiggins motion. The Court held a bench trial on the remaining claims against Defendant United States on November 3, 4, and 5, 2009.

**B. Factual Findings**

The Court has reviewed the stipulations in the final pre-trial order. Based on this review, and the Court's assessment of the credibility of the witnesses and evidence presented at trial, the Court **FINDS** the following facts:

Plaintiff's cause of action arose on January 29, 2007, when, while employed by Sigmon Group as an installation technician, he was working aboard the USS Theodore Roosevelt ("the Roosevelt") which was docked at the Naval Base in Norfolk, Virginia. (Final Pre-Trial Order 1.) Plaintiff was in hanger bay number 1 helping move lockers on the vessel, when at approximately 12:30 p.m., a twenty ton forklift ("the 20k"), operated by Fredrico Aguilar, a

member of the crew of the Roosevelt, ran over Plaintiff's left foot, which resulted in his left leg having to be amputated. (Final Pre-Trial Order 1-2.) Just prior to the accident, Plaintiff was speaking with Shawn Chausee, another worker on the Roosevelt, about 10 to 15 feet to the right of the forklift near the door into Hanger Bay 2. (Nov. 3 Tr. 25-26; 45-46.) Plaintiff and Mr. Chausee then walked over to move a locker, and repositioned themselves about five feet away from the forklift's path. (Nov. 3. Tr. 27.) Plaintiff and Mr. Chausee then prepared to lift the locker. (Nov. 3. Tr. 27-28.) At the time of the accident, Mr. Chausee was assisting Plaintiff with loading the locker on a dolly and facing the forklift. Plaintiff had his back to the forklift, getting ready to pull back on the dolly and was facing Mr. Chausee. (Nov. 3 Tr. 46-48.) Plaintiff testified that he was standing with his body adjacent to the forklift. (Nov. 3 Tr. 47-48.) At the moment of impact, Plaintiff was holding the dolly with both hands with his left foot extended in preparation to pull the dolly back. (Nov. 3 Tr. 47.) After the forklift hit Plaintiff's left foot, Mr. Chausee heard people shouting at the forklift driver to stop. (Nov. 3 Tr. 29.)

Although not required by Navy or any other regulations, it was the private practice of the Roosevelt to always have spotters and safeties in place during the operation of forklifts on the vessel. (Nov. 4 Tr. 399; Nov. 5 Tr. 432-433.) Spotters were in charge of directing the forklift operator where to place the load. Safeties were responsible for clearing the forklift's path, and alerting the driver of any objects or personnel in its way. (Nov. 4 Tr. 344.) There was no four-man team in place acting as spotters and safeties at the time of Plaintiff's accident. (Nov. 4 Tr. 405-407.) Rather, Petty Officer Anthony Jones was both the forward spotter and safety for forklift operator Petty Officer Aguilar at the time of the accident, directing the forklift where the load was going and whether or not it was safe for the forklift to move. (Nov. 4 Tr. 401.) Petty

Officer Jones used non-verbal communications in order to establish contact with the other safeties that day. (Nov. 4 Tr. 409-410.)

Petty Officer Jones was standing by the elevator on the hanger bay and saw Plaintiff standing with Mr. Chausee across from the elevator, over to the right side of the forklift. (Nov. 4 Tr. 402-403.) From Petty Officer Jones' view, Plaintiff was standing with the box in between Plaintiff and the forklift. (Nov. 4 Tr. 404.) Petty Officer Jones saw Plaintiff approximately ten feet away from the path on which the forklift was traveling, what he considered to be a safe distance. (Nov. 4 Tr. 404.) However, Petty Officer Jones turned his back immediately before the accident in order to spot where the load was going, and thus did not see the impact. (Nov. 4 Tr. 412-413.)

The driver of the forklift at the time of Plaintiff's injury, Petty Officer Aguilar, was licensed and trained to operate the 20k; however, the license paperwork that was supposed to be in his training record or jacket during the forklift operation was inexplicably missing. (Nov. 4 Tr. 361-362.) Petty Officer Aguilar had operated the 20k multiple times prior to the accident, and was the preferred 20k operator on the Roosevelt. (Nov. 4 Tr. 399.) Petty Officer Aguilar made two successful passes with the forklift in moving palletized lockers on the vessel before injuring Plaintiff on the third pass. (Nov. 4 Tr. 347-352.) When going forward and picking up the first load of pallets, Aviation 3 Griffin acted as Petty Officer Aguilar's front safety, and an unidentified civilian contractor acted as his rear safety. (Nov. 4 Tr. 347.) The second load was maneuvered the same way, except Petty Officer Aguilar's rear safety was replaced by another civilian contractor, and Petty Officer Jones acted as a forward safety. (Nov. 4 Tr. 347-348.) Petty Officer Jones was in the front of the load toward the right of the forklift. (Nov. 4 Tr. 349.)

4

When backing up the third load, Petty Officer Aguilar steered around a locker box toward the left, straightened the forklift to have a straight shot toward the elevator, and then stopped the forklift. (Nov. 4 Tr. 349.) It was at this time that Petty Officer Aguilar saw Plaintiff, for the first time, to the right side of the forklift with the dolly and the locker. (Nov. 4 Tr. 349.) At that point, Petty Officer Aguilar recognized that Plaintiff was standing with the box in between Plaintiff and the forklift at a safe distance of five feet from the path of the forklift. (Nov. 4 Tr. 350.)

Petty Officer Aguilar then turned the forklift to the left, and began slowly moving the forklift forward. (Nov. 4 Tr. 351.) As the forklift moved forward, Petty Officer Jones was spotting where the load was to be placed, and had repositioned himself with his back toward Petty Officer Aguilar. (Nov. 4 Tr. 412-413.) The left turn of the forklift caused the right rear tire to extend out from the forklift to the right. (Nov. 4 Tr. 375-376.) Petty Officer Aguilar did not realize that the right rear tire of the 20k had struck Plaintiff until someone stopped him. (Nov. 4 Tr. 352.) When Petty Officer Aguilar stepped down from the forklift, he saw Plaintiff in a different position than at last sight: in between the right wheel of the forklift and the locker box. (Nov. 4 Tr. 352.)

No witness observed the actual impact. Plaintiff testified that after he was injured, the medical team arrived to assist him. (Nov. 4 Tr. 49-50.) Plaintiff's injuries to his foot were so severe that his left leg had to be amputated below the knee. (Nov. 3 Tr. 51.)

## II. CONCLUSIONS OF LAW

Plaintiff was an employee person covered under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950. The owner of the vessel in a third-party negligence

action may be held liable under 33 U.S.C. § 905(b). In *Scindia Steam Navigation Co. v. De los Santos*, 451 U.S. 156 (1981), the Supreme Court outlined the shipowner's duties to a longshoreman or ship repairman in a 905(b) negligence case. The parties agree, as they must, that under *Scindia*, the vessel may be liable if it actively involves itself in the repair operations and negligently injures a repairman. *Id.* at 167. Additionally, vessel owners have the duty to exercise:

> "ordinary care under the circumstances to have the ship and its equipment in such a condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Id.* Thus, a plaintiff's recovery under a § 905(b) action depends on his ability to establish that the United States breached one of the duties owed to the plaintiff, and that the breach was a proximate cause of the plaintiff's injuries. A shipowner may rely on an experienced ship repairman to act with reasonable care in carrying out his job duties, and to avoid hazards. *See Polizzi v. M/V Zephyros II Monrovia*, 860 F.2d 147, 149 (5th Cir. 1988); *Ludwig v. Pan Ocean Shipping Co.*, 941 F.2d 849, 852 (9th Cir. 1991). Therefore the ship owner may "leave unremedied conditions that would otherwise be considered unreasonably dangerous to less skilled persons." *Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204, 1208 (9th Cir. 1988). However, if the shipowner has actual knowledge that a dangerous condition exists, and a reasonable belief that the repairman cannot avoid the danger, the shipowner has a duty to take reasonable steps to eliminate or neutralize the hazard. *Scindia*, 451 U.S. at 175.

*Scindia* codified existing non-statutory general maritime negligence concepts. *See Eagle-Picher Indus. Inc. v. United States*, 846 F.2d 888, 895 (3d Cir. 1988); *see also Ward v. Norfolk Shipbuilding & Drydock Corp.*, 770 F. Supp. 1118, 1121 (E.D. Va. 1991). The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law. *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008). These elements include: (1) the existence of a duty required by law that obligates a person to conform to a certain standard of conduct to protect others against unreasonable risks of harm; (2) a breach of said duty by engaging in conduct that falls below the applicable standard; (3) a causal connection between the improper conduct and the resulting injury; (4) an actual loss or injury to the plaintiff because of the improper conduct. *Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000); *see also Heckenliable v. Va. Peninsula Reg'l Jail Auth.*, 491 F. Supp. 2d 544, 555 (E.D. Va. 2007).

The plaintiff has the burden of proof of negligence, proximate cause and injury by a preponderance of the evidence. *Murray*, 215 F.3d at 463. Negligence is a proximate cause only when without such negligence the injury would not have occurred or could not have been avoided. *See Hurley v. United States*, 923 F.2d 1091, 1094 (4th Cir. 1991). In essence, the plaintiff must prove that the "defendant's breach of duty was more likely than not (i.e. probably) the cause of the injury." *Id.* Negligence "cannot be presumed from the mere happening of an accident." *See Jones v. United States*, 342 F. Supp. 392, 398 (E.D. Va. 1972) (quoting *Weddle v. Draper*, 130 S.E.2d 462, 465 (Va. 1963)). It cannot be left to conjecture, guess or speculation. *Id.*

A vessel may fashion private safety rules to govern the conduct of its crew members.

7

However, "whether a given course of conduct is negligent, or the exercise of reasonable care must be determined by the standard fixed by law, without regard to any private rules of the party." *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 110 (4th Cir. 1995) (quoting *Virginia Ry & Power Co. v. Godsey*, 83 S.E. 1072, 1073 (Va. 1915)). Courts distinguish private rules from other policies and procedures "based on whether 'the rules were intended for the guidance of the company's employees' and whether 'the plaintiff was aware of [the rules].'" *McDonald v. Wal-Mart Stores East, LP*, 2008 U.S. Dist. LEXIS 2599, at *15-16 (E.D.Va. Jan. 14, 2008) (quoting *Pullen v. Nickens*, 310 S.E. 2d 452, 456 (Va. 1983)).

The doctrine of comparative negligence applies in cases under general maritime law. *See United States v. Reliable Transfer Co. Inc.*, 421 U.S. 397, 407 (1975); *see also Griffith v. Wheeling Pittsburgh Steel Corp.*, 531 F.2d 31, 35-36 (3d Cir. 1975) (finding "no reason [as to] why the *Reliable Transfer* rule should not apply in noncollision as well as in collision maritime cases"). Although an employee's assumption of risk is not a defense, under a comparative negligence regime, the fact finder may divide loss between a negligent plaintiff and a negligent defendant. *Id.; see also Gehlken v. McAllister Towing & Transp. Co.*, 2007 U.S. Dist. LEXIS 62790, at * 27 (D.S.C. Jan 29, 2007). The Defendant bears the burden of proof that Plaintiff was comparatively negligent. *See McCoy v. United States*, 689 F.2d 1196, 1198 (4th Cir. 1982). In comparative negligence cases, a defendant is required to demonstrate that the plaintiff's failure to exercise ordinary care for his own safety is negligence that contributed to the accident. If the Court finds that the negligence of the plaintiff contributed to his injury, his damages shall be diminished in proportion to the amount of negligence attributable to the plaintiff. *Diaz v. United States*, 655 F. Supp. 411, 418 (E.D. Va. 1987) (citing *Reliable Transfer*, 421 U.S. at

8

411).

## III. ANALYSIS

### A. Whether the Defendant Acted Negligently to Cause the Accident.

Thus, the relevant question for the Court is whether the Defendant's conduct can be characterized as negligent in that Defendant, as shipowner, failed to exercise due care for the safety of the Plaintiff. Plaintiff alleges that the United States, as owner and operator of the vessel upon which Plaintiff was injured, is responsible for the negligence of the vessel's crew, thereby entitling Plaintiff to damages. (Compl. ¶ 1.) Specifically, Plaintiff asserts that his injuries were caused by the negligence of the United States' agents and employees because: (1) the driver of the forklift was neither properly trained, certified, nor licensed to drive the forklift; (2) the driver of the forklift was negligent in his operation of the forklift by failing to pay proper attention to Plaintiff's location; (3) the driver of the forklift was not supervised and no spotter was with the forklift, as required; (4) the forklift was not appropriate for the task in which it was being used. (Compl. ¶ 4.) Plaintiff further asserts that Plaintiff was not contributorily or comparatively negligent. (Compl. ¶ 5.) The Court will address each of Plaintiff's arguments in turn.

#### 1. The Forklift Driver's Training, Certification and License

Plaintiff argues that Petty Officer Aguilar should not have been operating the forklift the day of the accident because he had not received proper training or licensing. Petty Officer Aguilar testified that he went through the four-step process of qualifying to operate the 20k in January of 2005. (Nov. 4 Tr. 339.) After passing the test, the paperwork was lost, so he went through the licensing process again. (Nov. 4 Tr. 340.) Petty Officer Aguilar also went through

the licensing procedure in order to operate the 6,000 pound forklift. (Nov. 4 Tr. 341.) Petty Officer Jones testified that Petty Officer Aguilar was in fact licensed and qualified to operate the 20k, however the proper paperwork did not make it into his training record. (Nov. 4 Tr. 398.) Furthermore, Petty Officer Aguilar had the most experience in operating the 20k of any crew member on the Roosevelt. (Nov. 4 Tr. 399.)

The internal training Petty Officer Aguilar received aboard the Roosevelt instructed operators to maintain a five-foot safety distance from objects and personnel when moving aircraft. The Roosevelt adopted this custom for all forklift operations as well. (Nov. 4 Tr. 344.) Petty Officer Aguilar was also trained to operate the forklift with at least three safeties or spotters, recognizing them by either verbal or nonverbal signaling. (Nov. 4 Tr. 344-345.)

Based on this testimony, the Court finds that, the paperwork issues notwithstanding, Petty Officer Aguilar was a trained and experienced forklift driver. Moreover, Petty Officer Aguilar understood the importance of remaining at a safe distance of at least five feet from others when operating the 20k and making contact with safeties or spotters before moving the forklift. The lack of proper physical paper licensing the day of the accident, even if a breach of Defendant's ordinary care, was neither a contributing factor nor the proximate cause of Plaintiff's injuries.

### 2. The Forklift Driver's Operation of the Forklift

Plaintiff next asserts that Petty Officer Aguilar saw Plaintiff in a safe position of five feet away when the forklift backed up and then stopped. (Nov. 5 Tr. 524-525.) However, when moving the forklift forward and turning the wheel to the left, Petty Officer Aguilar's only safety turned his back and Petty Officer Aguilar began moving the forklift forward without looking in

the area in which it was moving. (Nov. 5 Tr. 525.) It was at this time, Plaintiff argues, that Petty Officer Aguilar could not see Plaintiff in his blind spot and the left turn of the wheel caused the right rear tire to swing out and strike Plaintiff's foot and ankle. (Nov. 5 Tr. 525-526.)

The Court finds that Plaintiff was in fact in a "blind spot" when the forklift struck him. Furthermore, Plaintiff was standing with his back to the forklift just prior to the accident. However, the evidence reveals that on the day of the accident, Petty Officer Aguilar adhered to the training that he received and acted with due care in his operation of the forklift. The Court finds credible the testimony of Petty Officer Aguilar that the path of the forklift was at least five feet away from Plaintiff just prior to moving the forklift forward because when Petty Officer Aguilar saw Plaintiff as he began going forward, Plaintiff was on the *other side* of the locker box. (Nov. 4 Tr. 350.) Thus, the box was in between the forklift and Plaintiff at a distance of five feet from the forklift's path. Furthermore, the undisputed evidence at trial was that the front of the forklift passed Plaintiff when he was in Petty Officer Aguilar's plain view, as did the front wheels and the operator. (Nov. 5 Tr. 529.) Although Petty Officer Aguilar's testimony indicated that it was only speculation that Plaintiff must have moved his body around the box, it is simply implausible for this Court to find otherwise. The Court finds Plaintiff's claim that he was adjacent to the forklift's path, that is in between the forklift and the box, before it started forward to be incredible. Plaintiff had to have repositioned himself only after the front part and cab of the forklift had cleared him, otherwise the front part of the forklift would have more than likely hit him. Moreover, Petty Officer Aguilar's statement regarding the location of Plaintiff before the forklift moved forward is also supported by the testimony of Petty Officer Jones (Nov. 4 Tr. 404), and explains why Petty Officer Jones turned his back to see where to spot the

load.

Based on the evidence, the Court finds that Petty Officer Aguilar acted reasonably in moving the forklift forward into what was only a momentary blind spot only after ensuring that Plaintiff was still at a safe distance of five feet away from the path of the forklift and on the other side of the box. It was at this point that Petty Officer Aguilar could rely on Plaintiff as an experienced ship repairman to not place himself in a position of danger. The Court recognizes that Petty Officer Aguilar did not turn his head to the right to check his back wheel upon proceeding forward. However, after ensuring that the area was safe, this Court finds that his decision to move forward in the forklift was nonetheless reasonable. Accordingly, the Court finds that Petty Officer Aguilar did not breach his duty to act as a responsible forklift operator and was therefore not negligent in operating the forklift.

### 3. The Forklift Spotter's Supervision of the Forklift

Plaintiff's next argument is that Petty Officer Jones was an irresponsible spotter when he turned his back to Plaintiff immediately before the forklift struck his foot. As an initial matter, the only Navy instruction concerning the use of spotters or safeties during forklift operations is that they are required "whenever the operator's view is obstructed when driving in any direction, or when moving long loads, such as missile and torpedo containers." Additionally, spotters "[m]ust position themselves such that they have a clear view of the operator; a clear view of the load being handled and any obstructions to be avoided." (Nov. 4 Tr. 432; Def.'s Ex. 12.) The Court finds that Defendant did not violate this instruction. The operator's view was not obstructed, and the spotter had a clear view of the operator and the load of palletized lockers. Therefore, the Court finds that it was solely the voluntary, private decision of the Roosevelt to

use spotters and safeties for this particular 20k operation on the Roosevelt. (Nov. 5 Tr. 433.)

In determining whether conduct is negligent, this Court must follow the standard of duty fixed by law, as opposed to the private rules of the party. *Hottle*, 47 F.3d at 106. However, the evidence reveals that in this case Plaintiff was aware of the Roosevelt's use of spotters and safeties prior to the accident. (Nov. 3 Tr. 48.) Thus, the fact that neither OSHA nor Navy regulations required the use of spotters in this instance cannot by itself shield Defendant from liability. *See Pullen*, 310 S.E. 2d at 456. Because Plaintiff had been working around this forklift that morning, and was aware of spotters and safeties directing the forklift, he could rely not only on himself and his team leader, but also on the forklift spotters and safeties to act responsibly. Therefore, Petty Officer Jones had the duty to carry out his job as a reasonable spotter and safety.

Petty Officer Jones and Lieutenant Commander Ronald Rancourt testified that there is no official government or industry criteria or training specifying the duty of a forklift spotter or safety. (Nov. 4 Tr. 399; Nov. 5 Tr. 431-432.) However, the factual findings reflect that the duty in this case requires a spotter or safety such as Petty Officer Jones to ensure that the forklift is moving along a safe path, and furthermore to alert personnel of any immediate danger, if discovered. The Court finds that Petty Officer Jones did carry out his job responsibly. Crew members on the vessel developed the practice of using a four-person team of spotters and safeties when using forklifts, similar to the procedure used when working around aircrafts. (Nov. 4 Tr. 399.) The four-person team would consist of one safety in the front, one safety in the rear, a spotter, and a forklift driver. (Nov. 4 Tr. 405-406.) However, it was also the common practice for spotters to act as safeties, telling the forklift driver both where to place the

load and whether or not the forklift was moving along a safe path. (Nov. 4 Tr. 400.) Therefore, the four-person team custom was not always followed. Although not specifically trained as such, it was also common for safeties and spotters on the Roosevelt to keep the forklift at least five to ten feet away from other people or objects. (Nov. 4 Tr. 408.)

The Court finds that Petty Officer Jones followed the most important protocol, which was to ensure that the forklift's path was clear of any people before directing it to move forward. Petty Officer Jones walked to the right side of the forklift and saw that Plaintiff was at least five feet away with the box in between him and the forklift before turning to direct the forklift where to place the load. (Nov. 4 Tr. 402-404.) As Petty Officer Aguilar proceeded forward in the forklift, he lost eye-to-eye contact with Petty Officer Jones on the right-hand side of the forklift. (Nov. 4 Tr. 379.) However, unfortunately for Plaintiff, the mere fact that the accident occurred only seconds after Petty Officer Jones turned his back does not prove by a preponderance of the evidence that Petty Officer Jones actions as a spotter and safety were irresponsible and fell below any standard of duty he owed to Plaintiff. This Court cannot impose or simply create a higher duty on Defendant when the evidence discloses that forklift spotters and safeties were voluntary under Navy instructions in this instance, and that Petty Officer Jones' actions based on the training that he received were nothing other than reasonable and responsible. The evidence presented at trial reveals that an ordinarily prudent spotter and safety under these circumstances would direct the forklift to move forward only after determining that the path was clear. This Court finds that Petty Officer Jones did just that. He had no additional duty to anticipate the negligence of an experienced ship repair worker.

### 4. The Forklift's Appropriateness for the Job

Plaintiff's final argument in his complaint is that the 20k was not appropriate because the size of the forklift was too large for the task of moving the palletized lockers. The 20k was the only forklift available to assist the ship repairmen that day. (Nov. 4 Tr. 344-345.) There was no evidence presented at trial to indicate that the 20k was improper or unsafe for the job involved. There was, however, some discrepancy as to whether the backup alarm on the 20k was working that day. The Court finds that regardless of whether the alarm was fully functional or not, there was no argument that Petty Officer Aguilar was moving in any direction other than forward when the forklift struck Plaintiff, such that the alarm would have sounded. Therefore, the failure of the alarm to sound, if true, is not negligence.

### B. Negligence of Plaintiff

The Court must next consider whether the actions of the Plaintiff contributed to or caused his injuries. Defendant has the burden of proof in demonstrating that the negligence of Plaintiff caused or contributed to his injury. *See Reliable Transfer*, 421 U.S. at 407. The Defendant may rely on the expertise of a ship repairman such as Plaintiff to act with reasonable care. *See, e.g., Polizzi*, 860 F.2d at 149. In this case, Defendant contends that Plaintiff's inattention to his surroundings while working around the forklift was the sole cause or at least a contributing factor to his injuries. (Nov. 5 Tr. 534-535.)

The Court concludes that Plaintiff did not exercise reasonable care to stay aware of the forklift's location in his movements with the dolly. At the moment of impact, Petty Officers Aguilar and Jones had every right to rely on the expectation that Plaintiff would not place himself in the path that the forklift had traveled on two previous passes, and move from the

15

place where Petty Officer Aguilar saw him at last sight: five feet away from the forklift's path. On the record presented, this Court concludes that the negligence of the Plaintiff caused the unfortunate injuries which he sustained.

Although he did not know before the day of the accident that he would be working around the 20k, Plaintiff had been working on the vessel that morning, and was therefore aware of the fact that the forklift had been loading and unloading cargo in the area in which he worked prior to the accident. (Nov. 3 Tr. 48.) Furthermore, Plaintiff attended safety training sessions prior to the accident in which he was told to always pay attention when working around a forklift, whether or not there were safeties or spotters present. (Nov. 3 Tr. 65-66.) He was also told that if he was not paying attention, the forklift could injure him or others. (Nov. 3 Tr. 66.) Even more specifically, Plaintiff was told that if someone is not paying attention around the forklift, the forklift could potentially run over that person's foot. (Nov. 3 Tr. 66.) Ron Signiorno, qualified by the Court as an expert in the field of marine cargo handling and marine occupational safety, testified that there are cardinal rules that a longshoreman such as Plaintiff should be accustomed to following when operating around a forklift. (Nov. 5 Tr. 460-61.) Key among these rules is that employees should never lose track of potentially dangerous activities that are happening around them. (Nov. 5 Tr. 461.) The Court finds that based on his training from Sigmon, this was a cardinal rule that Plaintiff should have known to follow but failed to do so.

The 20k that struck Plaintiff had made two successful passes on similar paths before injuring Plaintiff on the third pass. Plaintiff and Mr. Chausee were initially 10 to 15 feet away from the forklift's path, but then moved to a distance of five feet away from the forklift to lift

16

the locker with the dolly. (Nov. 3 Tr. 25-27; 45-46.) Plaintiff testified that he never moved from his position with his body adjacent to the forklift before it hit him. (Nov. 3 Tr. 47-48.) However, after reviewing Plaintiff's and other witnesses' testimony, the Court finds that it is simply implausible that Plaintiff did not move into the path of the forklift from the safe distance of at least five feet if, moments before the accident, Petty Officers Aguilar and Jones saw Plaintiff on the right side of the forklift with a locker in between the forklift and Plaintiff. (Nov. 4 Tr. 350; Nov. 4 Tr. 402-404.) The forklift was going slow enough that Plaintiff did have the time and opportunity, all in one motion, to move to the other side of the box and extend his leg to lift the dolly just as the right rear tire extended.

Plaintiff was aware of the Roosevelt's internal protocol of using spotters and safeties around the 20k just prior to the accident. He saw Petty Officer Jones acting as a spotter and safety in front of the forklift. (Nov. 3 Tr. 48.) However, Plaintiff was not in a situation where he was helpless to exercise due care for his own safety. Rather, Plaintiff was in an equal position to avoid the potential hazard. Moreover, Plaintiff's "team leader" on the scene at the time of the accident, Shawn Chausee, was "[Plaintiff's] eyes" on the hanger bay, there to determine that area was not dangerous. (Nov. 3 Tr. 48.) Even though Mr. Chausee testified that he did not see Plaintiff move from his position, he also testified that he was assisting Plaintiff in lifting the box onto the dolly. Mr. Chausee stated that he was bending down to pick up the cabinet, and then looked up at Plaintiff only at the moment the forklift hit his foot. (Nov. 3 Tr. 28.)

Thus, Mr. Chausee could not have been fully aware of Plaintiff's movements moments before the accident. The Court finds Mr. Chausee's testimony that Plaintiff never moved from

his position not credible. Furthermore, Plaintiff does not remember what happened during the ten seconds before to the accident. (Nov. 3 Tr. 73.) Therefore, it is speculation at best that he did not move from a position of safety to a position of danger in a matter of seconds, just as the forklift's rear tire extended. *See Jones*, 342 F. Supp. at 398 ("It is incumbent on the plaintiff who alleges negligence to show how and why the accident happened, and if that is left to conjecture, guess or random judgment, he cannot recover.") (quoting *Weddle*, 130 S.E.2d at 465).[1]

In any event, moments before the accident, Plaintiff had completely lost track of the six-cylinder, diesel engine forklift; he did not hear it, and he did not see it. (Nov. 3 Tr. 74-76). The evidence discloses that Defendant was in fact prudent in using the forklift responsibly and with due care. Petty Officers Jones and Aguilar were entitled to rely on Plaintiff to be aware of his surroundings and to not place himself in the forklift's path. Plaintiff was remiss in these duties, and as such, there was a mutual reliability in place to which Plaintiff failed to adhere. Because the shipowner has no duty to anticipate the action or inaction of a careless longshoreman or ship repairman, Plaintiff must look only to his employer for compensation for his injuries.

---

[1] However, even if this Court were to assume that Plaintiff did not move from his position, it still does not explain by a preponderance of the evidence how the forklift's rear right tire made up the five-feet distance that was necessary to strike Plaintiff. Plaintiff testified that he had his left foot extended only a few inches when the forklift struck him. (Nov. 3 Tr. 48.) Plaintiff also testified that the forklift was about five to six feet away from him right before the forklift began its third pass. (Nov. 3 Tr. 78.) The forklift's rear tire was shown to the Court to extend, at most, two feet from the forklift when turning. (Def. Ex. 2B, 2C). There was no testimony that the wheel protruded five feet. This Court finds that Petty Officer Aguilar did not veer less than five feet away from the box when he started his movement. Therefore the only way that the forklift could have made up the two or three feet of distance was for Plaintiff to move his body toward the forklift's path.

## IV. CONCLUSION

The Court finds that Plaintiff has failed to establish, by any clarity or conviction that Defendant's actions were negligent. Proof by a preponderance of the evidence of Defendant's breach of duty by engaging in conduct that falls below the exercise of reasonable care is a fundamental requirement for Plaintiff to succeed on each of his claims. In this case, that requirement cannot be established and therefore each of Plaintiff's claims fails. For the reasons stated above, the Court awards judgment to **DEFENDANT**.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to the parties.

**IT IS SO ORDERED.**

/s/
Raymond A. Jackson
United States District Judge

Norfolk, Virginia
January 6, 2010